# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE NIKI AND | ) | |
| DARREN IRREVOCABLE TRUST | ) | |
| AND THE N AND D DELAWARE | ) | C.A. No. 2019-0302-SG |
| IRREVOCABLE | ) | |
| TRUST | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: March 20, 2024
Date Decided: July 24, 2024

Jon E. Abramczyk, Todd A. Flubacher, Matthew R. Clark, Courtney Kurz, and Anne Grae Martin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Petitioner Comerica Bank & Trust, NA*.

Thomas A. Uebler and Sarah P. Kaboly, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware, *Attorneys for Respondent Niki Tesak*.

W. Donald Sparks, II, Chad M. Shandler, and Christine D. Haynes, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Respondent Darren Rushin*.

William M. Kelleher, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware, *Attorney for Respondent Ildiko Juhasz de Tesak*.

**GLASSCOCK, Vice Chancellor**

Ildiko Juhasz de Tesak ("Ildiko")[1] is a wealthy and successful resident of El Salvador. In 2012, she settled a substantial, irrevocable trust to provide for her daughter, Claudia Elena Tesak ("Niki"), and Niki's then-husband, Darren J. Rushin ("Darren"), and their children. That 2012 trust[2] made Ildiko the life beneficiary, able to request the income but not to invade the principal. Upon her death, the trust corpus would fund two successor trusts, one for benefit of Niki (funded with 55% of the corpus) and one in favor of Darren (funded with the remainder). Upon their deaths, the trust would be distributed in equal shares to their children in successor trusts. The 2012 Trust was established in California. Ildiko was the Trustee. The 2012 Trust declares itself "irrevocable" at Article 1.3 but also provides a revocation mechanism at Article 7.1, which requires the assent of Ildiko, Darren and Niki. The settlor does not have a unilateral right of revocation. The trust is explicitly not subject to amendment.[3]

By 2014, for a number of reasons, the parties wanted to amend the trust. Darren in particular wanted an amendment that would accelerate vesting of the successor trust in his favor upon divorce. That is, the 2012 Trust did not vest for the

[1] I follow the practice of counsel here and refer to the litigants by first name or preferred name for the sake of clarity; no disrespect or familiarity is intended.
[2] I refer to the trust formed under California law in 2012 as the "2012 Trust" and the 2014 Trust organized in Delaware as the "2014 Trust." I note that the 2012 Trust was moved to Delaware, briefly, before it was (purportedly) decanted into the 2014 Trust, and presumably remains a Delaware trust.
[3] JX12 at 739 § 7.2.

benefit of Darren until Ildiko's death; Darren sought an amendment that would allow his portion to vest as soon as he and Niki *divorced*. With the help of counsel, the parties created a new trust. This 2014 Trust would be a Delaware trust. Defendant Comerica Bank & Trust, NA was the named trustee. The 2014 Trust had some substantial differences from the 2012 Trust. First, it provided for Darren's desire to have his interest vest upon divorce; if divorce occurred before Ildiko's death, she would thus be divested of the right to receive the life income from his "share" of the trust. Next, the successor trust shares between Darren and Niki were adjusted, from 45%/55%, respectively, to 50%/50%. Finally, the 2014 Trust provided that upon distribution of the remainder interest that the beneficiaries would include not only the pair's children together, but "all lineal descendants of all degrees and . . . persons legally adopted into the class."[4] These changes were largely in favor of Darren, at the expense of Niki and Ildiko, and the "divorce provision" created a perverse incentive for the marriage of Darren and Niki. Ildiko and Niki, nonetheless, consented to the changes.

Ildiko, to facilitate the funding of the 2014 Trust, first transferred the domicile of the 2012 Trust to Delaware, and named Comerica co-Trustee. The two Trustees then attempted to fund the 2014 Trust by purporting to "decant" the entire contents of the 2012 Trust into the 2014 Trust, under Delaware law. Decanting—the

---

[4] JX95 at 3404 §§ 8.5, 8.6, 8.7.

2

withdrawal of the assets from one trust and pouring them into a second trust—is allowed under our applicable trust statute[5] with respect to irrevocable trusts, but only where and to the extent that the trustee has the power to invade the corpus (a power absent here regarding the principal purportedly decanted). The 2014 Trust was subsequently additionally funded with other assets, as well.

In 2017 Darren proposed a "financial divorce" from Niki, and the couple was formally divorced in 2018. This triggered the vesting of Darren's successor trust under the terms of the 2014 Trust. Thereafter, Comerica, joined by Ildiko, brought this action for instructions; Ildiko argued that the decanting was invalid as a matter of law, and the assets in the 2012 Trust had not been effectively transferred to the 2014 Trust, and were thus not subject to the divorce provision in the latter trust. I found this declaratory relief barred by unclean hands;[6] Ildiko, as a fiduciary and beneficiary to the trust, was seeking to benefit from her statutory malfeasance in attempting the illegal decanting to fund the 2014 Trust. Niki, however, was not a trustee of the 2012 (or 2014) Trust, and currently seeks a declaration that the purported decanting was a nullity.

The matter is before me, post-trial. Darren appears to concede that the decanting was not authorized by statute. He argues that equity should act to confirm

---

[5] *See* 12 *Del. C.* § 3528.
[6] *See In the Matter of Niki and Darren Irrevocable Tr. and the N and D Del. Irrevocable Tr.*, 2020 WL 8421676, at *3 (Del. Ch. Feb. 4, 2020) ("Mem. Op.").

3

the purported transfer of assets to the 2014 Trust, under a variety of theories. I find that the attempted decanting was not permissible under the statute, and that the assets purportedly decanted should be deemed never to have left the 2012 Trust. I do not agree that equity is sufficiently invoked to confirm or support the transfer of assets. A number of issues remain to this litigation, in particular tracing of assets in the 2014 Trust and Darren's breach of duty claims against Comerica and Ildiko, but I find that the assets reposed in the 2012 Trust at the time of the ineffective decanting remain in the 2012 Trust. My reasoning follows.

## I. BACKGROUND

*A. Factual Background[7]*

### 1. The Parties

Ildiko Juhasz de Tesak is a citizen of Hungary and El Salvador and a resident of El Salvador.[8] She is not a U.S. citizen.[9]

Claudia Elena Tesak ("Niki") is a citizen of El Salvador and a resident of California.[10]

---

[7] This Memorandum Opinion only contains facts necessary to my analysis. Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX __". *See* Parties' Joint Trial Ex. List, Dkt. No. 275. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Granted (Stipulation and [Proposed] Joint Pretrial Order), Dkt. No. 284. References to the trial transcripts are cited as "Tr. __:__". 12-4-2023 Trial Tr.—Volume I, Dkt. No. 292; 12-5-2023 Trial Tr.—Volume II, Dkt. No. 293; 12-6-2023 Trial Tr.—Volume III, Dkt. No. 294.

[8] PTO ¶ 9.

[9] *Id.*

[10] *Id.* ¶ 11.

Darren J. Rushin is a resident of California.[11]

Comerica Bank & Trust, NA ("Comerica") is a national bank with an office for the conduct of trust business in Wilmington, Delaware.[12] Comerica has administered the 2014 Trust[13] from its offices in Delaware since it accepted its appointment as Trustee of the 2014 Trust in 2015.[14]

### 2. Events Leading to the 2012 Trust and its Creation and Provisions

Ildiko married Pablo Tesak in El Salvador and the pair had three children: Niki, Carla Tesak Arzente, and Jose Andres Tesak Juhasz.[15] Ildiko and Pablo were married for almost 40 years, until his death.[16] During his lifetime, Pablo co-founded Productos Alimenticos Diana SA de CV ("Diana"), a snack food conglomerate headquartered in El Salvador.[17] After founding Diana, Pablo formed another snack food company in El Salvador named Bocadeli.[18] Pablo owned 50% of Diana and Bocadeli was owned equally by Niki, Carla, and Andy.[19]

---

[11] *Id.* ¶ 12.
[12] *Id.* ¶ 13.
[13] *Id.* ¶ 31.
[14] *Id.*
[15] *Id.* ¶ 9.
[16] Tr. (Ildiko) 8:16–12:21, 37:22–24; JX56 at 4047.
[17] PTO ¶ 16. Ildiko is prominent in her own right; she received a Ph.D. in law from Eötvös Loránd University and is an honorary counsel of Czech Republic and Israel. Tr. (Ildiko) 9:1–19, 35:14–15.
[18] PTO ¶ 18.
[19] Tr. (Ildiko) 12:22–13:19; Tr. (Niki) 105:17–106:24.

Niki and Darren married in El Salvador in 1997.[20]  Prior to their marriage, Darren held various jobs ranging from sales to private tennis coach to private pilot.[21] After marrying Niki, Darren worked at Bocadeli as a general manager of the company for approximately a year before he and Niki moved to California in 2004.[22] In order to fund the move and their living expenses in California, Niki sold her shares of Bocadeli to Carla and Andy for $15 million.[23]  Two years later, Niki and Darren executed a trust instrument, on June 16, 2006 (the "2006 Trust"), which was never funded.[24]  The 2006 Trust instrument specified that if Niki and Darren divorced, the trust would be divided into two equal shares and administered as separate trusts (the "Divorce Provision").[25]  Three years after the execution of the (never funded) 2006 Trust, Pablo passed away.[26]

In 2012, Ildiko executed a trust (the "2012 Trust") to benefit Niki, Darren, Niki and Darren's two children, and herself.[27]  Ildiko settled the 2012 Trust on April 30, 2012.  The 2012 Trust was administered in and governed under the laws of California.[28]  Ildiko was the settlor, trustee, and sole income beneficiary of the 2012

---

[20] PTO ¶ 14.
[21] Tr. (Darren) 425:23–428:9.  Darren also ran a business in El Salvador.
[22] PTO ¶ 19.
[23] Tr. (Niki) 119:6–13, 123:12–24, 126:3, 225:15–17.
[24] PTO ¶ 20.
[25] JX1 at Schedule A, ¶ A-1(a)-(b).
[26] PTO ¶ 10.
[27] *Id.* ¶ 21.
[28] JX12 at 733; *Id.* at 740–41 § 9.3, 751 § 12.7.

Trust.[29]  The 2012 Trust was funded with Ildiko's interest in Global Infinity, Inc.[30]

Global Infinity is an investment company that holds various securities and Ildiko is

its sole director.[31]  Previously in 2003, Ildiko had granted Niki and Darren power of

attorney over Global Infinity.[32]   Through the years, Darren primarily made

investment decisions on behalf of Global Infinity by working closely with the

Tesak's family advisor, Robert Brower.[33]

The 2012 Trust is irrevocable by the settlor.  It may, however, be revoked with

the unanimous consent of the settlor (Ildiko) and the two first-order remainder

interest holders (Niki and Darren).[34]  The 2012 Trust further provides that the trustee

is authorized to distribute to Ildiko "as much of the annual net income of the Trust .

. . as [Ildiko] may request" but does not authorize the distribution of principal to

Ildiko.[35]   Further, the trustee was prohibited from making any "distribution of

income or principal . . . to any person other than [Ildiko]."[36]  Upon Ildiko's death,

the 2012 Trust would be divided into separate trusts, with 55% held for Niki's benefit

---

[29] PTO ¶ 22.
[30] *Id.* ¶ 23.
[31] *Id.*
[32] JX6.
[33] Tr. (Niki) 129–30; Tr. (Darren) 455:21–456:21; JX259 at 10–11.  Robert Brower is an account manager with UBS Financial Services and has managed Global Infinity's assets since its formation.  JX259 at 31.
[34] JX12 at 733, 739 §§ 1.3, 7.1.
[35] *Id.* at 734 § 2.1.
[36] *Id.*

and 45% held for Darren's benefit.[37]   Subsequently, Niki and Darren would be entitled to distributions of "as much of the income and principal" of their separate trusts "as the Trustees consider necessary for [their] health, education, support, and maintenance in [their] accustomed manner of living."[38]

To assist with the creation of the 2012 Trust, Ildiko hired California attorney Miguel Leff, who in turn sought the assistance of Janet Ambrozek, another California attorney, to assist in drafting the trust documents.[39]  Despite the fact that Ildiko was the sole client listed on the engagement letter, Niki and Darren participated in each discussion with the attorneys concerning the creation of the trust,[40] with Darren primarily leading these discussions.[41]

### 3. Formation of the 2014 Trust

Two years after the formation of the 2012 Trust, Mr. Brower informed Ildiko, Darren, and Niki that he did not feel comfortable with the ability of Mr. Leff and Ms. Ambrozek to provide accurate tax advice, in light of the amount of assets involved in trust.[42]  Darren was dissatisfied with the 2012 Trust for reasons of his own, as Mr. Brower also informed him that the 2012 Trust did not contain a Divorce

---

[37] *Id.* at 734 §§ 3.1, 3.1.1, 3.1.2.
[38] *Id.* at 735–36 §§ 4.1, 5.1.
[39] PTO ¶ 21.
[40] Tr. (Darren) 448:16–454:2.
[41] *See, e.g.*, JX5; JX8; JX9; JX11; JX12; Tr. (Darren) 445:23–446:8.
[42] Ex. 7 to Notice of Lodging (Dep. Tr. of Robert L. T. Brower) 36:4–38:23, Dkt. No. 286 ("Brower Dep."); JX259 at 36, 113–16, 131.

Provision, as had the (unfunded) 2006 trust.[43] Darren avers he was unaware that the 2012 Trust did not contain a divorce disposition scheme until Mr. Brower so informed him.[44] In Darren's view the provisions of the 2012 Trust were "supposed" to mirror the 2006 Trust, which contained the Divorce Provision, and should include an even 50/50 spilt of the trust upon the triggering of the Divorce Provision.[45] Darren stressed the importance of these issues to Niki over multiple occasions.[46] Neither Niki nor Ildiko ultimately refused consent to Darren's request.[47]

Mr. Brower recommended that Ildiko contact Patrick Martin at Procopio, Cory, Hargreaves & Savitch LLP ("Procopio") to review the 2012 Trust and potential tax issues.[48] Darren retained Mr. Martin in March 2014.[49] On June 4, 2014, Darren, Mr. Leff, Ms. Ambrozek, and Mr. Martin—but not Ildiko or Niki—met at the offices of Procopio in San Diego.[50] Darren directed Procopio to draft a new trust with distribution provisions that followed the 2006 Trust, not the 2012 Trust.[51] In particular, Darren directed Procopio to form the trust to be divided equally upon

---

[43] Tr. (Darren) 462:6–12.
[44] *Id.* 462:13–16.
[45] Tr. (Niki) 164:2–12; Tr. (Darren) 466:7–10.
[46] Niki stated that Darren "kept saying, although no one else has corroborated this since, that they made a very big monetary mistake, it was going to cost us I don't know how much money, and that Patrick Martin and him were fixing it and that we needed another trust and he wanted one that had a divorce clause and that had 50/50." Tr. (Niki) 164:2–10.
[47] Tr. (Darren) 471:23–472:8.
[48] Brower Dep. at 36–38, 113–15; Tr. (Darren) 460:2–464:9.
[49] Tr. (Darren) 463:9–464:9; JX210.
[50] PTO ¶ 24.
[51] Tr. (Darren) 465:19–466:14.

Ildiko's death, and to include a provision that required his half of the trust to vest immediately upon a divorce occurring during Ildiko's life.[52] Again, neither Ildiko nor Niki objected to the inclusion of such a provision.[53]

After the June 4, 2014 meeting, Procopio drafted a set of documents to (a) transfer the situs of the 2012 Trust from California to Delaware; (b) appoint Comerica as co-trustee of the 2012 Trust; (c) create the 2014 Trust (the "2014 Trust") with Comerica as sole trustee; and (d) appoint principal and income of the 2012 Trust to Comerica as Trustee of the 2014 Trust under 12 *Del. C.* § 3528.[54] Later that year, Procopio attempted to determine the best method to transfer the assets from the 2012 Trust to the 2014 Trust.[55] During this strategic planning, Mr. Martin disregarded Mr. Leff's recommendation to revoke the 2012 Trust, since Mr. Martin believed that would have resulted in a $30 million gift transfer, which would have created a significant tax liability.[56] By its terms, the 2012 Trust could not be amended.[57] Eventually, Mr. Martin chose to use the decanting procedure in 12 *Del. C.* § 3528, which he understood allowed a trustee to decant trust assets to a new trust "when the trustee has the power to distribute principal."[58]

---

[52] Ex. 8 to Notice of Lodging (Dep. Tr. of Patrick W. Martin) 32–33, 127, 138, Dkt. No. 286 ("Martin Dep.").
[53] Tr. (Darren) 471:23–472:8.
[54] PTO ¶ 25.
[55] Martin Dep. 23.
[56] JX24.
[57] JX12 at 739 § 7.2.
[58] Martin Dep. 101–18, 181–82, 184–85; JX23; JX25; JX26.

The latter condition proved problematic, however. In a December 10, 2014 email, Mr. Martin relayed to Darren that the 2012 Trust did not specify that Ildiko, the settlor, was permitted to distribute the principal during her lifetime, which Mr. Martin attributed to a drafting omission by Ms. Ambrozek.[59] Within that same email, Mr. Martin informed Darren that the draft 2014 Trust still had the 45% and 55% beneficiary designations, as he believed the proposed 50% and 50% beneficiary designations raised "important technical issues."[60] Mr. Martin did not specify in his email what these "technical issues" were and was unable to recall what they were for purposes of this proceeding.[61] Sometime after the December 10, 2014 email, however, the draft of the 2014 Trust was changed to reflect an even 50/50 spilt between Niki and Darren, and to provide for the Divorce Provision under which Darren's share would vest upon their divorce.[62]

Procopio sent execution copies for the execution of the 2014 Trust to Niki on December 19, 2014, so that Niki could hand deliver the documents to Ildiko in El Salvador during the holidays.[63] The documents provided to Niki included an instruction letter for Darren, an instruction letter for Ildiko with a Spanish

---

[59] JX26; Tr. (Darren) 620:14–19.
[60] JX26 at 1.
[61] *Id.*; Martin Dep. 99.
[62] *Compare* JX30 at 794 § 2.2, *with* JX26 at 5582 § 2.2.
[63] JX33; JX34.

11

translation, and execution copies of the 2014 Trust and related documents with a Spanish translation.[64]

### 4. Execution of the 2014 Trust

On Christmas Eve of 2014, the Tesak family gathered in El Salvador for the holidays.[65] That same day, Ildiko, in her capacity as trustee, moved the situs of administration of the 2012 Trust to Delaware, changed the governing law to Delaware, and appointed Comerica to be the co-trustee of the 2012 Trust.[66] Also on this day, Ildiko settled the 2014 Trust, appointing Comerica as the sole trustee and leaving herself as life beneficiary.[67] Later, Ildiko and Comerica (the "Trustees"), as trustees of the 2012 Trust, decanted (or purported to decant) the 2012 Trust corpus into the 2014 Trust (the "Decanting").[68] Ildiko, in her capacity as one of the 2012 Trust's two co-Trustees, and Comerica executed a trustee resolution (the "Trustee Resolution") purporting to "exercise [her] discretionary power to distribute all of the principal and income of the 2012 Trust and appoint all of the principal and income

---

[64] JX33.
[65] PTO ¶ 26; JX33; *see also* Tr. (Niki) 175:4–176:8; Tr. (Darren) 483:9–484:7.
[66] JX84 at 3667. The parties disagree about the validity of the Decanting but have not contested the validity of any portion of the 2012 Trust, either as formed (under California law) or after transferred to Delaware (under Delaware law). Any such arguments have been waived, and therefore I assume that the 2012 Trust as of December 24, 2014, was a valid Delaware irrevocable trust, with its various provisions enforceable under Delaware law, and specifically subject to 12 *Del C.* § 3528.
[67] JX56 at 4016.
[68] JX84 at 3662.

of the 2012 Trust to Comerica . . . as trustee of the [2014] Trust . . . ."[69] The assets purportedly appointed to the 2014 Trust by the Trustee Resolution were the 2012 Trust's ownership interests in Global Infinity and Hacienda 2-503 LLC, which owns a condominium in Mexico.[70]

Ildiko, Niki, and Darren, as beneficiaries of the 2012 Trust, all signed acknowledgements and statements of non-objection or consent to the Decanting within three months of the execution of the Decanting.[71] The acknowledgements and statements of non-objection or consent provided that the each was aware of the current assets of the 2012 Trust and its various beneficial interests, and "[c]onsent[ed] to the [] Trustees of the [2012 Trust] exercising their discretionary power to distribute all of the principal and income of the [2012 Trust] to Comerica . . . as trustee of the [2014 Trust], pursuant to 12 *Del. C.* § 3528."[72] Each consent acknowledged that the undersigned "is aware of the undersigned's rights, and aware of all of the material facts in connection with the foregoing documents, the [2012 Trust], the [2014 Trust] and all of the other issues raised herein."[73]

---

[69] *Id.*
[70] PTO ¶ 34.
[71] JX84 at 3665; JX84 at 3658, 3660; PTO ¶ 28.
[72] JX84 at 3665; JX84 at 3658, 3660.
[73] *Id.*

According to Ildiko and Niki, neither reviewed the contents of the 2014 Trust's execution documents provided by Procopio,[74] and they contend that Darren did not make them aware that the 2012 Trust did not specify that Ildiko could distribute the principal of the 2012 Trust during Ildiko's lifetime.[75] Darren, by contrast, maintains that Ildiko and Niki were well aware of the provisions contained in the 2014 Trust, pointing to their executed consents.[76] Niki did not obtain nor consult separate counsel throughout the formation and execution of the 2014 Trust.[77] Ildiko, also, did not consult her own counsel, Mr. Leff, before signing the documents in December 2014.[78] In particular, once Mr. Leff discovered that Ildiko had signed the documents without first consulting him, he expressed his frustration to Procopio.[79] Despite this frustration, Mr. Leff thereafter gave Procopio the "green light" to execute the 2014 Trust, indicating that Ildiko did not have a desire to make any changes to the 2014 Trust.[80] Comerica executed the trust documents on June

---

[74] *See* Tr. (Ildiko) 42:19–43:3; Tr. (Niki) 182:18–24 ("Because Darren said this needed to be done for trust. He put it – I didn't – very casually, like, okay, Patrick just needs us to sign this. I got a notary. It's for the trust just to finalize, blah, blah, saying whatever nice thing he has to say, don't worry about it, it's just documents, something along those lines.").

[75] *See* Ex. 3 to Notice of Lodging (Dep. Tr. of Darren Rushin) 124:4–19 ("Darren Dep."), Dkt. No. 286; Tr. (Darren) 536:23–537:10; Tr. (Niki) 172:9–13.

[76] JX177; JX84 at 3665.

[77] Tr. (Niki) 182:18–24. This testimony, however, is conflicts with Niki's cross-examination at trial. *Id.* 242:18–243:5. Nevertheless this determination is not necessary for my analysis and I decline to resolve the dispute.

[78] Tr. (Ilidko) 64:23–65:22; *see also* JX177, Ex. E.

[79] JX52.

[80] JX55 at 1.

14

24, 2015, creating the "N and D Delaware Irrevocable Trust," that is, the 2014 Trust.[81]

### 5. The Validity of 2014 Trust is Questioned

In 2018, Darren's attorneys proposed a financial divorce from Niki, which would include separate trusts apart from the 2014 Trust, but would allow him to remain manager of all the assets and to receive a management fee.[82] Darren engaged Connolly Gallagher to explore avenues to modify the 2014 Trust pursuant to this plan, since lawyers at Procopio were unable to give advice on Delaware law because they were not Delaware attorneys.[83] Consequently, in April 2018 Niki engaged DLA Piper to advise her on the proposed financial divorce.[84] However, that same year, Niki and Darren separated and began divorce proceedings on June 20, 2018, in the Superior Court of California, County of San Diego.[85] On January 24, 2020, the court entered a decree dissolving their marriage effective December 20, 2019.[86]

In early 2019, Ildiko engaged Delaware counsel, Gordon, Fournaris & Mammarella, P.A., who received copies of the documents creating and executing the 2014 Trust.[87] It was not until the resulting review by Ildiko's counsel that she

---

[81] JX95.
[82] Tr. (Niki) 207:12–15; JX134; JX135; Tr. (Darren) 625:7–21.
[83] JX133.
[84] PTO ¶ 37; Tr. (Niki) 202:21–203:3, 203:24–204:4; Darren Dep. 190:12–21. Niki did not engage DLA Piper at this time to initiate divorce proceedings. Tr. (Niki) 204:18–20.
[85] PTO ¶ 15.
[86] *Id.* ¶ 105.
[87] *Id.* ¶ 40.

claims to have first become aware that the Decanting creating the 2014 Trust may be invalid.[88] On February 15, 2019, Ildiko's Delaware attorneys contacted Deborah Taylor, Comerica's trust officer in Delaware, to advise her that Ildiko and her counsel believed that the Decanting, and thus the funding of the 2014 Trust, was invalid.[89] Following Ms. Taylor's call with Ildiko's lawyers, Comerica retained Delaware trust counsel, Morris, Nichols, Arsht & Tunnell LLP, to review the Decanting.[90] Consequently, Comerica concluded that the Decanting was invalid since the Trustees lacked the power to distribute principal during Ildiko's lifetime, and the interests of the remainder beneficiaries under the 2014 Trust were not substantially identical to their interests under the 2012 Trust.[91]

*B. Procedural History*

Comerica initiated this action on April 22, 2019, by filing a Verified Petition pursuant to 10 *Del. C.* § 6504 requesting instruction from this Court to determine whether the Decanting was void and whether the Court should order that the principal and income appointed to the 2014 Trust return to the 2012 Trust.[92] On August 27, 2019, Darren filed his Answer, Counterclaims, and Cross-Claims.[93]

---

[88] *See* Tr. (Ildiko) 21:5–12.
[89] PTO ¶ 41; Ex. 1 to Notice of Lodging (Dep. Tr. of Deborah E. Taylor) 43–49, 55, Dkt. No. 286.
[90] PTO ¶ 42.
[91] Ex. 6 to Notice of Lodging (Dep. Tr. of Todd A. Flubacher, Esquire) 11:22–12:16, Dkt. No. 286.
[92] Verified Pet. for Instructions Pursuant to 10 *Del. C.* Section 6504, Dkt. No. 1.
[93] Darren J. Rushin's Answer to the Verified Pet. for Instrs. and Verified Countercls. and Cross-Cls., Dkt. No. 32.

Comerica filed a Motion for Judgment on the Pleadings on April 23, 2020,[94] which was joined by Ilidko and Niki five days later.[95]

Darren filed an Amended Answer, Counterclaims, and Cross-Claims shortly thereafter,[96] asserting that (1) Comerica had breached its fiduciary duties as trustee of both the 2012 Trust and the 2014 Trust, (2) Ildiko had breached her fiduciary duty as trustee of the 2012 Trust, (3) Ildiko had aided and abetted Comerica's breach of fiduciary duties, and (4) there existed a civil conspiracy between Ildiko and Comerica.[97]  Ildiko and Comerica responded on June 10 and June 23, 2020, respectively.[98]  Comerica filed a revised Motion for Judgment on the Pleadings on June 30, 2020,[99] which was again joined in by both Ildiko and Niki.[100]  On July 14, 2020, Darren responded to the Petitioner's Motion and filed his own Cross-Motion for Judgment on the Pleadings.[101]

After the matter was briefed and argued, I denied the Trustees' Motion, holding that the doctrine of unclean hands, pertaining to Ildiko and Comerica, barred

---

[94] Pet'r's Mot. for J. on the Pleadings, Dkt. No. 81.

[95] Ilidko Juhasz de Tesak's Joinder in Pet'r's Mot. for J. on the Pleadings, Dkt. No. 86; Niki's Joinder to Comerica's Mot. for J. on the Pleadings, Dkt. No. 87.

[96] Darren J. Rushin's Am. Answer to the Verified Pet. for Instrs. and Verified Am. Countercls. and Cross-Cls., Dkt. No. 95.

[97] Id. ¶¶ 40–68.  Darren also seeks, as Counts VI and VII, the removal of Comerica as trustee of both the 2012 Trust and the 2014 Trust.  Id. ¶¶ 69–75.

[98] Ildiko Juhasz de Tesak's Resps. to Darren Rushin's Am. Countercls. and Cross-Cls., Dkt. No. 99; Pet'r-Countercl.-Def.'s Resp. to Verified Am. Countercls., Dkt. No. 100.

[99] Revised Opening Br. in Supp. of Pet'rs' Mot. for J. on the Pleadings, Dkt. No. 102.

[100] Ildiko Juhasz de Tesak's Revised Joinder in Pet'r's Mot. for J. on the Pleadings, Dkt. No. 103; Niki's Revised Joinder to Comerica's Mot. for J. on the Pleadings, Dkt. No. 104.

[101] Resp't James [sic] Darren Rushin's Cross-Mot. for J. on the Pleadings, Dkt. No. 105.

the Court from hearing the merits of the Verified Petition.[102]  I found, *inter alia*, that Comerica and Ildiko, as Trustees, had a duty to ensure that the Decanting did not violate applicable statutory law, but nonetheless *relied in their petition on their assertion that they had violated the law*.  In that case, I found, they could not themselves invoke equity on that basis to benefit one of the beneficiaries to the detriment of another, and to benefit Ildiko, as a beneficiary, as well.[103]

On October 21, 2021, Niki filed an Amended Answer to the Verified Petition, which added a Counterclaim and Cross-Claim against Comerica and Darren respectively, seeking a declaration that the Decanting was invalid and void *ab initio* and seeking the return of the decanted assets to the 2012 Trust.[104]  Darren then asserted a cross-claim for conspiracy against Niki, which was identical to his claim against Comerica and Ildiko and sought a declaration instructing Comerica to distribute any non-decanted assets in accordance with the terms of the 2014 Trust.[105]

---

[102] Mem. Op. *3.
[103] *Id.* at *7.
[104] Claudia Elena Tesak de Rushin's Am. Answer to Verified Pet. for Instrs., Countercl., and Cross-Cl., Dkt. No. 164.
[105] Darren J. Rushin's Answer to Niki's Verified Countercl. and Cross-cl. and Verified Am. Countercl. and Cross-Cl., Dkt. No. 184.

Niki moved to dismiss Darren's Amended Counterclaim and Cross-Claim on March 16, 2022.[106] The motion was fully briefed on June 8, 2022.[107] At oral argument, I deferred ruling on the motion and directed the parties to mediation pursuant to Court of Chancery Rule 174(c).[108] The parties were unable to resolve their dispute in mediation, and the parties commenced fact discovery.[109] On June 26, 2023, Darren moved for partial summary judgment on his breach of fiduciary claims and related claims for damages.[110] On July 12, 2023, I deferred decision on Niki's motion to dismiss and Darren's motion for partial summary judgment until trial.[111]

I conducted a three-day trial on December 4 through December 6, 2023.[112] After trial, each party submitted their respective post-trial opening[113] and answering

[106] Claudia Elena Tesak de Rushin's (Niki's) Mot. to Dismiss Darren Rushin's Am. Countercl., Dkt. No. 185.

[107] *See* Claudia Elena Tesak de Rushin's Opening Br. in Supp. of her Mot. to Dismiss Darren's Civil Conspiracy Cl., Dkt. No. 192; Resp't Darren James Rushin's Answering Br. in Opp'n to Niki's Mot. to Dismiss Darren's Civil Conspiracy Cross-Cl., Dkt. No. 194; Niki's Reply in Supp. of Her Mot. to Dismiss Darren's Civil Conspiracy Cl., Dkt. No. 207.

[108] Tr. of 7.7.22 Oral Arg. and Rulings of the Ct. on Defs.' Mot. to Dismiss 30:6–32:12, Dkt. No. 216; Order, Dkt. No. 219.

[109] *See* Stipulation and Proposed Order Modifying Case Schedule, Dkt. No. 221.

[110] Resp't Darren Rushin's Mot. for Partial Summ. J., Dkt. No. 258.

[111] Letter to Counsel, Dkt. No. 266.

[112] Trial before Vice Chancellor Sam Glasscock dated 12.4.23 through 12.6.23, Dkt. No. 291.

[113] Ildiko Juhasz de Tesak's Post-Trial Br., Dkt. No. 297 ("Ildiko OB"); Niki Tesak's Post-Trial Opening Br., Dkt. No. 298 ("Niki OB"); Darren Rushin's Opening Post[-]Trial Br., Dkt. No. 299 ("Darren OB"); Pet'r-Countercl. Def. Comerica Bank & Trust, NA's Opening Post-Trial Br., Dkt. No. 300 ("Comerica OB").

briefs.[114]  I heard post-trial oral argument on March 20, 2024, and considered the matter submitted that day.[115]

This Memorandum Opinion only concerns the validity of the Decanting (and whether equitable relief may result); other claims in this matter will be addressed separately.

## II. ANALYSIS

The question before me is whether the assets of the 2012 Trust were validly decanted into the 2014 Trust.  Niki seeks the following relief: (a) a declaration that the Decanting was invalid under Delaware law and void *ab initio*; (b) a declaration that Darren's equitable defenses do not preclude Niki's claims or otherwise validate the invalid decanting and are meritless; and (c) an order instructing Comerica that the assets of the 2012 Trust purportedly decanted to the 2014 Trust be returned to the 2012 Trust *nunc pro tunc*, among other requests for relief.[116]  Niki has the burden of proving that the Decanting violated 12 *Del. C.* § 3528(a).[117]

---

[114] Ildiko Juhasz de Tesak's Post[]trial Answering Br., Dkt. No. 307 ("Ildiko AB"); Pet'r-Countercl.-Def. Comerica Bank & Trust, NA's Answering Post-Trial Br., Dkt. No. 308 ("Comerica AB"); Niki Tesak's Post-Trial Answering Br., Dkt. No. 309 ("Niki AB"); Darren Rushin's Answering Post[-]Trial Br., Dkt. No. 310 ("Darren AB").

[115] Post-Trial Oral Arg. before the Honorable Vice Chancellor Sam Glasscock III on 3.20.2024, Dkt. No. 316.

[116] PTO ¶ 54.  Niki also seeks relief in the form of (a) an order transferring the non-decanted assets of the 2014 Trust to the 2012 Trust or directing Comerica to distribute those assets in further trust under the terms of the 2014 Trust; (b) a declaration that Niki is not liable for civil conspiracy or that Darren suffered no damages, or both; (c) a declaration that Darren has unclean hands; and (d) an order awarding her attorneys' fees and costs.  *Id.*

[117] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018).

20

*A. The Decanting is a Nullity and the Assets that were Decanted to the 2014 Trust Should be Returned to the 2012 Trust*

The Decanting Statute, 12 *Del. C.* § 3528(a), pertinently provides that:

> [A] trustee who has authority . . . to invade the principal . . . of a trust (the "first trust") . . . to make distributions to, or for the benefit of, 1 or more proper objects of the exercise of the power, may instead exercise such authority . . . by appointing all or part of such principal . . . subject to the power in favor of a trustee of a second trust . . . under an instrument other than that under which the power to invade is created . . . .[118]

In other words, to have the power to decant the principal from one trust to another, the trustee must have the power to invade and distribute that principal.

By referring to Section 3528 as the "decanting statute," and by the use of ellipses in quoting the statute, I do not mean to suggest that the section is limited solely to a "decanting" of the principal from one trust into a second trust. The section itself does not define the term "decant," and the subsection quoted does not even use that wording.

"Decant" is an interesting verb; its root is cant, or tilt.[119]  Originally, it meant to gently pour a liquid, as wine, into a new container, gradually tilting the old container so as to pour the clear liquor into the new, while leaving behind the lees or dregs.[120]  The term has been imported into trust law to describe the transfer of the

---

[118] 12 *Del. C.* § 3528 (a) (2020).
[119] *See Decant*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/decant (last visited July 11, 2024).
[120] *Id.*

essence of a beneficial interest from an old trust to a new, and presumably better, trust. The power of a trustee to thus decant logically must come from the power of that trustee to exercise her discretion to appoint or distribute the fruits of the beneficial interest under the terms of the old trust; from this, it follows, she has a concomitant (but not greater) power to transfer the beneficial interest to a new trust.

The extent to which such a power was recognized at common law in Delaware is unclear; since 2013 the power to decant is provided by statute, 12 *Del C*. § 3528. That statute has what must be one of the longer first sentences in our statutory law, *viz*:

> (a) Unless the terms of the instrument expressly provide otherwise, a trustee who has authority (whether acting at such trustee's discretion or at the direction or with the consent of an adviser), under the terms of a testamentary instrument or irrevocable inter vivos trust agreement (including a trust that, by its terms, is revocable but was created by a settlor who presently lacks the capacity to revoke the trust), to invade the principal or income or both of a trust (the "first trust") to make distributions to, or for the benefit of, 1 or more proper objects of the exercise of the power, may instead exercise such authority (whether acting at such trustee's discretion or at the direction or with the consent of an adviser, as the case may be) by appointing all or part of such principal or income or both as is subject to the power in favor of a trustee of a second trust, which may be a separate trust or the first trust as modified after appointment under this section (the "second trust") under an instrument other than that under which the power to invade is created or under the same instrument, provided, however, that, except as otherwise provided in this subsection:
>
> > (1) The exercise of such authority is in favor of a second trust having only beneficiaries who are proper objects of the exercise of the power except that the governing instrument of the second trust may provide that, at a time or upon an event

22

specified in the governing instrument, the remaining trust assets shall thereafter be held for the benefit of the beneficiaries of the first trust upon terms and conditions concerning the nature and extent of each such beneficiary's interest that are substantially identical to the first trust's terms and conditions concerning such beneficial interests;

(2) In the case of any trust, contributions to which have been treated as gifts qualifying for the exclusion from gift tax described in § 2503(b) (26 U.S.C. § 2503(b)) of the Internal Revenue Code of 1986 (26 U.S.C. § 1 et seq.) (hereinafter referred to in this section as the "I.R.C."), by reason of the application of I.R.C. § 2503(c) (26 U.S.C. § 2503(c)), the governing instrument for the second trust shall provide that the beneficiary's remainder interest shall vest and become distributable no later than the date upon which such interest would have vested and become distributable under the terms of the governing instrument for the first trust;

(3) The exercise of such authority does not reduce any income or unitrust interest of any beneficiary of a trust for which a marital deduction has been taken for federal tax purposes under I.R.C. § 2056 or § 2523 (26 U.S.C. § 2056 or § 2523) or for state tax purposes under any comparable provision of applicable state law; and

(4) The exercise of such authority does not apply to trust property subject to a presently exercisable power of withdrawal held by a trust beneficiary who is the only trust beneficiary to whom, or for the benefit of whom, the trustee has authority to make distributions.[121]

This is not pellucid draftsmanship. The gravamen of the subsection, as I read it, is that the discretionary or appointment power of a trustee toward a beneficiary, up to but not beyond such power, may instead be transferred to and administered from a new trust. Where, as here, the decanting is of the principal of the old trust,

---

[121] 12 *Del. C.* § 3528(a) (2020).

the power of the trustee to invade the principal of the old trust is a necessary predicate to the decanting.[122]

Niki argues that the Decanting is invalid because it violates 12 *Del. C.* § 3528(a)(1).[123] Niki asserts that the Trustees had no power to distribute the principal of the 2012 Trust, as they could only distribute income to Ildiko during her lifetime.[124] Niki also contends that the Decanting violated the statute since the 2014 Trust materially changed the remainder interests of Niki and Darren, as Darren's distribution interest increased, from 45% to 50%, and accelerated vesting in Darren upon divorce, rather than upon the death of Ildiko.[125] In addition, Niki argues that the 2014 Trust altered Niki's and Darren's power of appointment, as under the 2014 Trust if the pair failed to exercise the power of appointment, the remaining assets would be held in further trust for their respective children outside their marriage, compared to the 2012 Trust, which limited their power of appointment solely to the children that the pair had together.[126] I find the first point, regarding the Trustee's

---

[122] In my February 4, 2020 Memorandum Opinion in this matter, I did not reach the meaning of the statute, finding in any event that review of the Decanting was precluded by the doctrine of unclean hands. Nonetheless, in *dicta*, I interpreted (in a manner I find unpersuasive on further review) the "substantially identical" requirement of Section 3528(a)(1). That *dicta* is not binding as law of the case, and I do not rely upon it here.

[123] Niki OB 23–24.

[124] *Id.* at 23.

[125] *Id*. at 23–24.

[126] *Id*. at 24.

lack of power to invade the principal, compels me to deem the Decanting a nullity. Consequently, I need not address Niki's remaining assertions.

Darren no longer contests the validity of the Decanting,[127] but asserts a number of equitable claims to bar the return of the assets from the 2014 Trust to the 2012 Trust. First, Darren argues that the Decanting is voidable, not void since the parties could have consented to revoke the 2012 Trust to create the 2014 Trust, and that for equitable reasons I should confirm the Decanting.[128] Darren asserts that Niki's unclean hands[129] and her acquiescence and/or delay in bringing this action prevents her from obtaining the relief that she seeks.[130] Darren also contends that equity requires that the decanted assets remain in the 2014 Trust as the relief Niki seeks would improperly benefit Ildiko.[131]

---

[127] Tr. of 3-20-2024 Post-Trial Oral Arg. 50:9–13, Dkt. No. 317 ("Post Trial Oral Arg.").
[128] Darren AB 25–28.
[129] Darren OB 29–33.
[130] *Id.* at 40–44.
[131] *Id.* at 37–39. In addition, Darren claims that transferring all assets, including assets that did not stem from the 2012 Trust, in the 2014 Trust to the 2012 Trust would trigger a no-contest provision in the latter. *Id.* at 39–40. I need not address this issue here, because this decision deals with the Decanting alone. In particular, Darren argues that the assets in the 2014 Trust, which did not stem from the 2012 Trust, should be distributed according to the 2014 Trust's terms. *Id.* Following the creation of the 2014 Trust, additional assets were later contributed to the 2014 Trust, including interests in Villa Carisa Corp., Meow Holdings Corp., and Playacar Ventures LLC. Villa Carisa owns a rental property in St. Maarten, Meow Holdings owns a yacht, and Playacar owns two rental properties in Mexico. PTO ¶ 35. In addition, Niki seeks the return of assets in the 2014 Trust that derive from assets decanted from the 2012 Trust. Post Trial Oral Arg. 18:5–21:21. Darren also seeks to enforce a no-contest provision contained within the 2014 Trust. I reserve ruling on the distribution of assets that did not stem from the 2012 Trust, as well as those that can be traced to the 2012 Trust, and likewise as to any ancillary matters.

25

I find that the attempted Decanting was *ultra vires*, and a nullity. Ildiko did not retain the power to invade the principal of the 2012 Trust, and thus was not entitled under the statute to decant that principal. Because the purported Decanting is a nullity, the assets that theoretically flowed thereby from the 2012 Trust to the 2014 Trust should be viewed as never leaving the 2012 Trust. Under 12 *Del. C.* § 3528(a), trustees are empowered to decant the corpus of a trust where the trustee has the power to do so by virtue of the ability to appoint the principal. The 2012 Trust did not provide the Trustees the power to invade the principal during Ildiko's lifetime, as the 2012 Trust only provided for distribution of up to the *annual net income* of the trust to Ildiko. The Trustees purported to take the assets of the 2012 Trust and use them to fund the 2014 Trust, despite the lack of a power of Ildiko to invade the principle of the 2012 Trust.

Thus, the Decanting failed to satisfy the requirements of 12 *Del. C.* § 3528(a). Since the actions of the Trustees were premised on the Decanting Statute, and since they were not authorized by the statute, the purported Decanting is a nullity.[132]

---

[132] *See AGR Halifax Fund, Inc. v. Fiscina*, 743 A.2d 1188, 1192–95 (Del. Ch. 1999) (finding an amendment to a corporate charter invalid from its inception because the individuals, who were not yet elected to the board of directors, lacked the statutory authority under 8 *Del. C.* § 141(a) to approve an amendment that had not yet been proposed by the board, as required under 8 *Del. C.* § 242(b)); *Espinoza v. Zuckerberg*, 124 A.3d 47, 57 (Del. Ch. 2015) (explaining that purported ratification of corporate acts taken by written consent under 8 *Del. C.* § 228 are not effective unless it complies with the technical requirements of 8 *Del. C.* § 228); *see, e.g.*, *Robbins Hose Co. No. 1 v. Baker*, 2007 WL 3317598, at *8 (Del. Ch. Oct. 31, 2007) (determining appeal board which substituted its own judgment in reviewing a disciplinary action exceeded scope of authority

Consequently, the assets that stemmed from the Decanting must be viewed as never leaving the 2012 Trust.

### B. Equity is Not Sufficiently Invoked to Confirm or Support the Transfer of the 2012 Trust Assets

I next turn to Darren's assertion that equity is invoked to bar the relief that Niki seeks. He first relies on the doctrine of unclean hands.

This Court jealously guards its position as a court of equity. To protect that interest, and to prevent the exercise of equity from serving as a tool of oppression or unfairness, the Court may refuse "to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."[133] For the doctrine to apply, the alleged inequitable conduct "must have an 'immediate and necessary' relation to the claims under which relief is sought."[134] The actions of Niki that Darren sets forth to support his contention for the application of the doctrine pertain to her part in the creation of the provisions and execution of, and her acknowledgement and consent to, the 2014 Trust.[135] These actions do not

---

granted by its by-laws and holding that the appeal board's actions were *ultra vires*, thus void, and to be viewed as if they never happened); *see also Apple Comput., Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, at *15 (Del. Ch. Jan. 21, 1999) (stating "[v]oid acts, acts that are *ultra vires . . .* are legal nullities incapable of cure.").

[133] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. Sept. 28, 1998).

[134] *Id.* at 523 (quoting *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)).

[135] Darren argues that Niki has unclean hands because (1) she had ample time to review the 2014 Trust documents and signed them voluntarily, (2) was purportedly represented by counsel in connection with the 2014 Trust, (3) executed the acknowledgement and consent forms pertaining to the 2014 Trust, and (4) plotted with Ildiko to invalidate the 2014 Trust. Darren OB 29–36.

27

have an "immediate and necessary" relation to the *Decanting,* which is the sole issue at dispute in this matter.[136] More significantly, Niki did not owe a legal responsibility to Darren; as Trustees of the 2012 Trust, Ildiko and Comerica owed fiduciary duties to the trust's beneficiaries. Niki's consent to the terms of the 2014 Trust does not, to my mind, invoke unclean hands in her position on the Decanting. Thus, I find that the doctrine of unclean hands does not bar the relief that Niki seeks.

Asserting more equitable defenses, Darren claims that acquiescence and laches also bar relief. The parties argue about whether, in this setting, such equitable defenses as laches can operate to validate an illegal act.[137] I need not reach this issue, however. In order to invoke laches here, Darren must assert that Niki unreasonably delayed asserting her rights in a manner that led to his detriment. He has not pointed to a detriment which equity may address, however. The most he can refer to is the legal fees he has expended, which do not support laches here.[138] Darren also raises the ability of the beneficiaries to have vitiated the 2012 Trust, which would have

---

[136] *Compare* Darren OB 29–36 (asserting actions concerning the 2014 Trust attributable to Niki), *with* Mem. Op. *6 (identifying actions concerning the Decanting attributable to Comerica and Ildiko).

[137] Darren sets forth *Kraft* to support his contention that acquiescence and laches can be applied as a defense even if the Decanting is void. Darren OB 41–43; Post Trial Oral Arg. 44:2–46:10. In *Kraft*, the Court found that laches could be asserted as a defense even if the contract at dispute was considered void. *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 989 (Del. Ch. 2016). Darren attempts to distinguish *Kraft* from *Moelis*, a recent decision from this Court, which found that equitable defenses such as acquiescence and laches cannot validate void acts. *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 994, 1000 (Del. Ch. 2024).

[138] Darren OB 43.

resulted in the assets, theoretically, reverting to the settlor, Ildiko.[139]  Ildiko would

then have been free to settle a new trust, presumably with the same assets; such a

new trust could have contained the Divorce Provision.  Theoretically, if the

Decanting was unavailable (if Niki had, say, pointed out that decanting was illegal),

Darren believes that Niki and Ildiko would have used the revocation route to satisfy

his desire for the divorce condition, despite negative tax consequences.  Perhaps.

But that mere speculation is a reed too weak to support the application of laches.

And there is no indication that Niki was aware of the illegality of the Decanting until

shortly prior to this litigation, further preventing application of laches.

As for the doctrine of acquiescence, Delaware recognizes its application

where a claimant:

> has full knowledge of his rights and the material facts and (1) remains
> inactive for a considerable time; or (2) freely does what amounts to
> recognition of the complained of act; or (3) acts in a manner
> inconsistent with the subsequent repudiation, which leads the other
> party to believe the act has been approved.[140]

*Lehman Brothers*[141] and *Klaassen*[142] are instructive on how to apply the

doctrine of acquiescence.  "Based on the circumstances in both *Lehman Brothers*

and *Klaassen*," a litigant can assert that acquiescence applies as an affirmative

---

[139] Darren AB 25–26.
[140] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (citation omitted).
[141] *Lehman Bros. Hldgs., Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014).
[142]  *Klaassen*, 106 A.3d at 1035.

29

defense when "the [opposing party] had the ability to challenge the breach at the time of the alleged wrongdoing, or as damages were incurred thereby, such that the [opposing party] was adjudged complicit in the very breach for which [she] sought relief."[143]  In this circumstance, Darren must demonstrate that Niki was aware that the Decanting was illegal, a fact that was undoubtedly material to Niki's full knowledge of her rights.  Those facts were not demonstrated at trial.  Darren simply asserts that Niki knew about the divorce provision and that Mr. Leff had the opportunity to review the 2014 Trust and Decanting documents.[144]  That, without more, is insufficient to convince me that Niki was aware that the Decanting was a nullity and subsequently declined to assert her rights.  Thus, I find the doctrine of acquiescence unavailable under the facts.

Finally, Darren asserts that I have already found that Ildiko had unclean hands with respect to her request to invalidate the Decanting, and that vindicating Niki's position here would create a windfall for Ildiko.  But that is not the case, for a variety of reasons.  First, because this decision does not dispose of Darren's claim against Ildiko for breach of trust, any "benefit" may prove ephemeral.  In addition, unclean hands barred Ildiko from *employing equity* to benefit as a beneficiary from her malfeasance as a trustee.  That does not, to my mind, support Darren's invocation of

---

[143] *Fotta v. Morgan*, 2016 WL 775032, at *9 (Del. Ch. Feb. 29, 2016) (emphasis in original) (citing *Lehman Bros. Hldgs., Inc.*, 2014 WL 718430 at *9).
[144] Darren OB 41.

equity to ratify a null act, based on the fact that non-ratification would work an incidental benefit on the trustee. Here, I note, it was counsel acting primarily at the behest of Darren who proposed the Decanting, and I see no equitable bar to finding that the illegal Decanting was a nullity. Finally, to the extent equity is available and necessary to prevent a windfall to Ildiko, there are actions short of ratification of the Decanting which may be applied.[145]

### III. CONCLUSION

For the foregoing reasons, I find that the attempted decanting of the assets held by the 2012 Trust into the 2014 Trust was a null act, and that equity does not preserve the funding of the 2014 Trust with these assets. The parties should discuss how to employ this finding, and present a form of order.

---

[145] Such as, for instance, limiting Ildiko's access to the income of a portion of the restored 2012 Trust corpus, during her lifetime. I pose this by way of illustration only; by no means have I made a determination that such an action is justified in equity here.